## Taylor v. Taylor's Ex'r et al.

(Decided Nov. 5, 1937.)

J. CLARK TAYLOR, JR., PRIDE TOMLINSON and GAR-
LAND R. HUBBARD for appellant.

WOODWARD, DAWSON & HOBSON and WILBUR FIELDS for
appellees.

OPINION OF THE COURT BY JUDGE STITES—Affirming.

This is the fourth appeal that has been taken to
this court on various phases of the litigation arising out
of the administration of the estate of John Taylor, de-
ceased. See Taylor v. Taylor's Ex'rs, 211 Ky. 309, 277
S. W. 278; Taylor v. Taylor's Ex'rs, 218 Ky. 187, 291
S. W. 27; Taylor v. Taylor, 223 Ky. 799, 4 S. W. (2d)
752. The present appeal is taken from a judgment en-
tered in May, 1935, by the Marion circuit court on be-
half of the estate of John Taylor, deceased, against ap-
pellant, J. Clark Taylor, Sr., and his surety, in the sum
of $22,431.91, with interest on one item, and the further
sum of $5,250, with interest on a second item.

The will of John Taylor, deceased, was probated at
his domicile in Marion county, Ky., in 1917, and J. Clark
Taylor, Sr., together with John Taylor, Jr. (who has
since died), qualified as executors thereunder. Most of
the estate consisted of lands situated in Texas. Al-
though originally appraised in the neighborhood of
$350,000, the Texas real estate has been largely sold and
disposed of, and there has been an actual realization of
something over $700,000. The appellant has been active
in the management and liquidation of the property, and
has apparently received little aid from his coexecutor,
who seems to have died at some time prior to the events

material to this controversy. Since the death of his coexecutor, appellant carried on as sole executor up until May 6, 1929, when he was removed by order of the Marion county court. The record indicates that during the entire time that appellant served he was plagued and harassed by the actions and demands of the other beneficiaries under the will. An examination of the previous decisions of this court, noted above, will indicate the nature and extent of the feeling that has existed between the persons interested. Whether this feeling is or is not justified, under the circumstances, it is unnecessary here to consider. We will undertake to set out only such facts as we deem material to a proper decision of the phase of the controversy now before us.

Shortly after qualifying as executor, appellant undertook to sell the Texas lands and negotiated with various prospective purchasers in that state. By December, 1928, when the effort was first commenced to remove appellant as executor, most of the Texas real estate had been sold and arrangements had been made for the collection of deferred payments represented by notes secured by a vendor's lien through the First National Bank of Plainview, Tex. Decedent had maintained an account in this bank prior to his death, and this account was continued by his executors. At the time of the events here involved, the account stood in the name of "J. Clark Taylor, Executor." As payments were made at the bank on various lien notes or other obligations due the estate, the sums thus paid were credited to the appellant's account, and he was notified of the deposit and sent a duplicate deposit slip.

On the last appeal of this case (Taylor v. Taylor, 223 Ky. 799, 4 S. W. (2d) 752), it was held that J. Clark Taylor, Jr. (appellant's son), was not entitled to compensation as an attorney for the executors, although he was allowed $2,500 for clerical services. Shortly thereafter, J. Clark Taylor, Jr., brought a suit in Texas against J. Clark Taylor, Sr., and the executrix of the deceased, John Taylor, Jr. (coexecutor with appellant), in which he asked for a judgment in the sum of $25,000 as a fee for services as attorney under his alleged personal contract with the executors. An attachment was issued in this suit, and the sums on deposit in the First National Bank of Plainview and another Texas bank were impounded.

In the order of May 6, 1929, removing appellant from the office of executor, it was provided, in conformity to section 3840 of the Statutes, that:

"The said J. Clark Taylor is further ordered and directed to deliver the balance and the remainder of the assets of said estate in his possession or under his control to such personal representative of said estate of John Taylor, Sr., as this court may appoint."

The next day the court appointed James H. Robinson, since deceased, as administrator de bonis non c. t. a. Appellant himself testifies concerning his regard for these orders:

"Q. Did you make any effort to turn over this money to your successor, James H. Robinson? A. No. I fought Jim Robinson all along. I did not want him to have charge. Any man who stays drunk all the time is not fit to handle the funds of any estate, and I did not want him to handle the John Taylor Estate for that reason."

At another point in his deposition, he says:

"I had got the funds out of Kentucky where the cards had been stacked against me and I did not want it back there. I did not want Jim Robinson to have control of the funds."

Howsoever justified may have been appellant's feelings toward Robinson, it is obvious that the responsibility for appointing him and the right to appoint him rested in the court and not appellant, and it was clearly his duty to comply with the order even though it may have appeared to him to be a most unjust one under the circumstances. Under no view of the matter was he authorized to take the law into his own hands.

Robinson undertook to secure the funds deposited in the First National Bank at Plainview and brought a suit for this purpose in the United States District Court. Robinson v. First National Bank, 45 F. (2d) 613. The case was appealed to the Fifth Circuit Court of Appeals, and Robinson lost on the ground that he was without capacity to sue in Texas under his letters testamentary from a Kentucky court. Robinson v. First National Bank, 55 F. (2d) 209. This latter decision was handed down on January 13, 1932. The attachment suit by J. Clark Taylor, Jr., was still pending at that time and the

attachment was not discharged; indeed, it was continued for some time thereafter, and apparently until it was finally adjudicated by the Texas courts in 1934 that Taylor had no claim for a fee.

At some time during this period between May 6, 1929, and 1934, J. Clark Taylor, Sr., and two of the devisees who seem to have sided with him in the general controversy brought a suit in Texas for a partition of the property located in that state in spite of the fact that a settlement suit was pending in Kentucky. A receiver was appointed and the Texas assets have since, it appears, been cleared through him. However, the deposit in the First National Bank at Plainview, in the sum of $28,039.97, was not altered or withdrawn. In 1930, 1931, or 1932 (the record says one or the other in different places), the First National Bank, after consolidating with the Plainview National Bank, went into the hands of a receiver. It has paid one dividend of 20 per cent., leaving $22,431.91 still due. This is the principal amount of the judgment complained of on this appeal. The second item of $5,250 represents payments of attorney's fees to J. Clark Taylor, Jr., which were disallowed upon the former appeal and have never been refunded to the estate.

It is claimed by appellant that the deposit in the First National Bank of Plainview in the name of "J. Clark Taylor, Executor," was a sufficient earmarking of this account to indicate that the funds were charged with a trust and belonged to the estate of John Taylor. This would be true under the law of Kentucky. National Surety Company v. McNeill's Guardian, 251 Ky. 509, 65 S. W. (2d) 721; Mitchell v. First National Bank, 203 Ky. 770, 263 S. W. 15. It is at least doubtful if this is the law of Texas. In Robinson v. First National Bank, (C. C. A.) 55 F. (2d) 209, 211, the court said·

> "The general deposit and the notes were payable to J. Clark Taylor, executor, and not to him as executor of John Taylor, and would be considered at law his individual property; the word 'executor' being merely descriptio personæ."

Furthermore, it is admitted that the funds were attached in a suit against appellant individually, and not in his representative capacity. Certainly, if he had made any effort whatever to perform his duty to bring these funds to Kentucky in the first place, or to turn

the property over to his successor in the second place, it would have been possible to secure a prompt release of the attachment, unless under the law of Texas the levy was properly made upon his individual assets.

It is insisted that there was no collusion between appellant and his son in connection with the Texas attachment suit, and it is true that there is no direct testimony on this question, unless we are so to consider his admission that:

> "I had got the funds out of Kentucky where the cards had been stacked against me and I did not want it back there."

On the other hand, the circumstances impel a strong suspicion. When the suit was first filed appellant directed his Kentucky attorney to defend it. A petition was prepared and filed to remove the case to the United States District Court. Thereupon, appellant objected to the joining of his name in the petition, and the case was remanded. Appellant's defense thereafter was hardly a vigorous one, if we are to judge from the dates when steps were taken in the case. Appellant testifies now that he thinks his son should have been paid an attorney's fee even though he was allowed $2,500 for clerical services and collected several thousand dollars more in real estate commissions for sales of the Texas property. The son appears here as counsel for appellant, although just having lost a suit against him for $25,000, and, finally, it may be observed that the whole scheme fits in perfectly with appellant's confessed purpose to keep the assets out of Kentucky. It may be noted in passing that appellant, if there was no collusion, certainly can recover any loss on the attachment bond which undoubtedly was given in the Texas proceeding.

Aside from all the foregoing, it is obvious that appellant made no effort whatever to turn the property over to his successor, and actively undertook to delay or prevent the transfer to Robinson. In McCallister's Adm'r v. Stanley, 186 Ky. 836, 218 S. W. 237, 239, it is said:

> "It is generally held that a case of gross negligence is made out where it is shown that the property belonged to the estate, that it or its value could have been collected, and that the administrator made no effort to collect it other than to request its return."

We may well conclude that the Texas deposit was carried as the individual property of the executor, as determined by the Fifth Circuit Court of Appeals, and that he was therefore indebted to the estate in the amount carried in the account with the First National Bank of Plainview. But in addition to this fact, appellant owed a positive duty to transfer the funds in his hands to Kentucky for distribution, and, after his removal as executor, he owed a positive duty to transfer the control of these funds to his successor, even if the Texas proceedings prevented the actual removal of the property from that state. Instead of performing either of these duties, appellant followed a policy of attrition. Indeed, it is at least conceivable that he took affirmative steps to avoid being required to perform these obligations. He made himself an insurer. Surratt v. State, 167 Md. 357, 173 A. 573, 175 A. 191, 100 A. L. R. 1116; Coolidge v. Rueth, 209 Wis. 458, 245 N. W. 186, 85 A: L. R. 433. So far are we from doubting the finding of the chancellor on this phase of the case that we are unable to see how he could possibly have arrived at any other conclusion.

Finally, it is argued that appellant should be allowed a credit of $3,500 on the fees of $5,250 wrongfully paid J. Clark Taylor, Jr. It is asserted that appellant was paid $3,500 under a partial settlement made in October, 1927, and on November 9, 1927, refunded this sum to the estate, as shown by the final settlement. It is claimed that on the former appeal of this case, Taylor v. Taylor, 223 Ky. 799, 4 S. W. (2d) 752, an item of $3,500 was allowed for extraordinary expenses, and that appellant is therefore entitled to this credit. It will be a sufficient answer to this contention to point out to counsel that the $3,500 paid in the partial settlement they refer to was for "extraordinary service." This apparently was refunded, and on the appeal appellant was held to be entitled to $5,000 for "extraordinary service." The final settlement, later filed, shows that appellant was paid $3,500 for "Exr. Expenses allowed," and was paid $5,000 for "extraordinary services." On this condition of the record, we certainly would not be justified in setting aside the conclusion of the chancellor in this particular.

Judgment affirmed.